IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LOUIS ALFONSE OLONA,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>RYAN MAHR, Warden; SCOTT FRAKES, AARON BLIVEN, CAPTAIN MCCLYMONT, CAPTAIN PERLMAN, and ASSISTANT WARDEN ERICKSON,<br><br>　　　　Defendants. | 8:20CV171<br><br><br>**MEMORANDUM AND ORDER** |

　　This matter is before the court on Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6). (Filing 28.) Defendants filed a Brief in Support of Motion to Dismiss. (Filing 29.) Plaintiff did not file a response.

## I. BACKGROUND

　　Plaintiff is currently incarcerated at the Omaha Correctional Center ("OCC"). He sues the following Defendants in their individual capacities: Scott Frakes, Director of the Nebraska Department of Correctional Services ("NDCS"); Warden Mahr, Warden of the Community Corrections Center-Omaha ("CCC-O"); Aaron Bliven, Case Manager at the CCC-O; Captain McClymont at the OCC; Captain Perlman at the OCC; and CCC-O Assistant Warden Erickson. Plaintiff claims that he had a constitutionally protected liberty interest in maintaining his community-custody work-release status, but such status was revoked in violation of his Fourteenth Amendment right to procedural due process. He also claims that Defendants defamed him.

Plaintiff's Amended Complaint and the attached materials contain the following allegations:

As part of the CCC-O work release program, Plaintiff was employed at J. Skinner Bakery, where his usual schedule was 4:00 a.m. to 1:00 p.m. Plaintiff usually rode his bike nine miles to work each morning, leaving the CCC-O at 2:00 a.m. However, on February 18, 2020, his bike had a flat tire. The third-shift CCC-O staff was allegedly aware of Plaintiff's predicament because a correctional officer dropped Plaintiff off at 5:30 a.m. by the Omaha library, with his flat-tired bike, causing him to arrive to work three hours late and to work until 5:00 p.m. that day. ([Filing 19 at CM/ECF pp. 10](#), [15](#).) That night, Plaintiff returned to the CCC-O from his job at 7:31 p.m. and was directed to go to his room. Five minutes later, two correctional officers came to his room to "arrest" him.

At 8:26 p.m. that evening, Defendant Bliven filed a Disciplinary Misconduct Reporting Form against Plaintiff, erroneously stating that Plaintiff was "unaccounted for in the community for approximately six and a half hours." This statement contradicts Bliven's statement in the same report that according to Plaintiff's supervisor, Plaintiff had left his job at 5:00 p.m. Noting that inmate regulations only allow inmates two hours to travel to and from their jobs via the most direct route, Bliven charged Plaintiff with "unauthorized areas" and "violation of regulations." (*Id.* [at CM/ECF p. 10](#).)

Plaintiff filed an informal grievance, as well as Step 1 and Step 2 grievances, thereby completing the grievance process.

Investigating Officer Cpl. Knudsen reviewed Bliven's misconduct report on February 20, 2020, at 7:46 a.m., noting he "does not see how the times add up and are actually in question." (*Id.* [at CM/ECF p. 11](#).) A copy of the report was given to Plaintiff on February 20, 2020, at 7:51 a.m. According to the form, a hearing date was set for February 25, 2020, with representation, witnesses, and employee presence being requested.

A "Response and Reasons for Decision Reached" dated March 13, 2020, by the NDCS "Director's Designee" apparently contains the disposition of Plaintiff's Step 2 grievance. The report indicates that Bliven's misconduct report was "dismissed due to inaccuracies in one of the times stated." However, the report states that dismissal of the original misconduct report

> does not change the fact that your work schedule was from 0400-1300 hours. Including a 2 hour window for transportation, when taking the bus, would have placed you back at CCC-O at 1500 hours. CCC-O did not receive any phone calls from you notifying them you would be late. It was discovered you were not present for 1600 hour count at approximately 1625 hours; nearly 1.5 hours after you should have been back at CCC-O. You did not arrive at CCC-O until 1931 hours.

(*Id.* at CM/ECF p. 12.) The report further advised Plaintiff that he was "pending reclassification," and after such review was completed, Plaintiff could appeal the classification. The report described how Plaintiff could appeal a reclassification. At some point after this incident, Plaintiff was moved from the CCC-O to the OCC.

Plaintiff claims that at the OCC, Defendants McClymont and Perlman "grilled & questioned" him about the "Carmichael Death at CCC-O" and promised him that in exchange for information, Plaintiff would be returned to the CCC-O. Plaintiff alleges that CCC-O Assistant Warden Erickson also made such a promise. Plaintiff was never returned to the CCC-O. (*Id.* at CM/ECF pp. 5, 10.)

Plaintiff requests $25,000 for economic loss and as damages for contracting COVID-19 at the OCC and being placed in medical isolation as a result. Plaintiff demands that he be returned to the CCC-O and reinstated to his job.

Following review of the Amended Complaint, the court allowed Plaintiff's procedural due process and state defamation claims to proceed against Defendants in their individual capacities. (Filing 20.) On August 2, 2021, Defendants filed a Motion to Dismiss Plaintiff's Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6). (Filing 28.)

## II. STANDARD OF REVIEW

Defendants seek to dismiss Plaintiff's § 1983 due process claim under Fed. R. Civ. P. 12(b)(6) and his state law defamation claim under Fed. R. Civ. P. 12(b)(1). ([Filings 28](#) & [29](#).) Because dismissal of the state law claim is dependent upon the viability of the federal claim, the court will begin its analysis with whether Plaintiff has stated a federal due process claim under Fed. R. Civ. P. 12(b)(6).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order to satisfy this requirement, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Corrado v. Life Inv. Ins. Co. of Am.*, 804 F.3d 915, 917 (8th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In analyzing a motion to dismiss, the court must "accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party, but [is] not bound to accept as true '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements' or legal conclusions couched as factual allegations." *McDonough v. Anoka Cnty.*, 799 F.3d 931, 945 (8th Cir. 2015) (citations omitted) (quoting *Iqbal*, 556 U.S. at 678). "When considering a Rule 12(b)(6) motion, the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings." *Ashford v. Douglas Cnty.*, 880 F.3d 990, 992 (8th Cir. 2018) (quoting *Smithrud v. City of St. Paul*, 746 F.3d 391, 395 (8th Cir. 2014)).

## III. ANALYSIS

### A. Fourteenth Amendment Due Process Claim

Plaintiff claims that he had a constitutionally protected liberty interest in maintaining his community-custody work-release status, but such status was revoked in violation of his Fourteenth Amendment right to procedural due process.

A plaintiff must establish that he was deprived of a protected liberty interest to successfully assert a § 1983 due process claim. *Sandin v. Conner*, 515 U.S. 472, 487 (1995). "Protected liberty interests may arise from two sources—the Due Process Clause itself and the laws of the States." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (quotation omitted); *see also Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *Jenner v. Nikolas*, 828 F.3d 713, 716 (8th Cir. 2016); *Persechini v. Callaway*, 651 F.3d 802, 806 (8th Cir. 2011); *Callender v. Sioux City Residential Treatment Facility*, 88 F.3d 666, 668 (8th Cir. 1996); *Edwards v. Lockhart*, 908 F.2d 299, 301 (8th Cir. 1990). "Generally, 'due process requires that a hearing before an impartial decisionmaker be provided at a meaningful time, and in a meaningful manner.'" *Booker v. City of Saint Paul*, 762 F.3d 730, 734 (8th Cir. 2014) (quoting *Coleman v. Watt*, 40 F.3d 255, 260 (8th Cir. 1994)). A plaintiff is entitled to due process only when a protected property or liberty interest is at stake. *See Hopkins v. Saunders*, 199 F.3d 968, 975 (8th Cir. 1999).

#### 1. Due Process Clause

"A liberty interest inherent in the Due Process Clause arises when a person has a substantial, albeit conditional, freedom such as when he is on probation or parole." *Callender*, 88 F.3d at 668 (citing *Edwards*, 908 F.2d at 301). In *Edwards*, the court held that an inmate enrolled in an Arkansas work release program had a protected liberty interest that arose from the Due Process Clause itself because the participant no longer lived in an institution but lived in the community. 908 F.2d at 302. "As the Tenth Circuit noted: '*Edwards* . . . correctly identifies the dispositive

5

characteristic that marks the point at which the Due Process Clause itself implies a liberty interest: it is the fact of release from incarceration.'" *Nelson v. Skrobecki*, No. 4:14CV3010, 2016 WL 75056, at *2 (D. Neb. Jan. 6, 2016) (quoting *Harper v. Young*, 64 F.3d 563, 566 (10th Cir. 1995)).

According to Plaintiff's Amended Complaint, the conditions of Plaintiff's work release were much more restrictive than those at issue in *Edwards* and, therefore, more analogous to institutional life than to probation or parole. *See Callender*, 88 F.3d at 668 (holding prisoner's work release program did not provide the sort of substantial freedom necessary to give rise to a protected liberty interest inherent in the Due Process Clause such that would entitle him to due process of law before program was terminated). Specifically, the *Edwards* plaintiff was allowed to live completely outside of a penal institutional setting at her parents' home. In contrast, Plaintiff lived at the CCC-O, and could leave the facility only within pre-approved limits of confinement. Therefore, the court finds that the allegations in Plaintiff's Amended Complaint fail to establish that his work release program provided the sort of substantial freedom that gives rise to a liberty interest inherent in the Due Process Clause. *See Callender*, 88 F.3d at 668.

### 2. State-Created Liberty Interest

The court further finds that the laws of Nebraska do not create a liberty interest in remaining in the work release program.[1] In *Sandin*, the Supreme Court held that

---

[1] The relevant portion of Neb. Rev. Stat. § 83-184 reads as follows:

(1) When the conduct, behavior, mental attitude, and conditions indicate that a person committed to the department and the general society of the state will be benefited, and there is reason to believe that the best interests of the people of the state and the person committed to the department will be served thereby, in that order, and upon the recommendation of the board in the case of each committed offender, the director may authorize such person, under prescribed conditions, to:

6

states may create liberty interests that afford prisoners due process protections, but explained:

> [T]hese interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

515 U.S. at 484 (internal citations omitted) (emphasis added)[2]; *see also Persechini*, 651 F.3d at 806. A state-created liberty interest arises when a state's actions will

---

. . . .

>> (b) Work at paid employment or participate in a training program in the community on a voluntary basis whenever:
>>
>>> (i) Such paid employment will not result in the displacement of employed workers, or be applied in skills, crafts, or trades in which there is a surplus of available gainful labor in the locality, or impair existing contracts for services; and
>>>
>>> (ii) The rates of pay and other conditions of employment will not be less than those paid or provided for work of similar nature in the locality in which the work is to be performed[.]

Neb. Rev. Stat. § 83-184.

[2] Prior to the Supreme Court's decision in *Sandin*, the Eighth Circuit Court of Appeals used a two-part test to determine whether the state had created a constitutionally protected liberty interest: (1) whether the statutes contained particularized substantive standards that significantly guided decisions and (2) whether the statutes used mandatory language. *Hake v. Gunter*, 824 F.2d 610, 614 (8th Cir. 1987). In *Sandin*, however, the Supreme Court held that its prior emphasis on the mandatory language of statutes, rather than the essence of the deprivation, "encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." 515 U.S. at 473.

7

inevitably affect the duration of the sentence. *Sandin*, 515 U.S. at 487. In *Sandin*, the Court found that thirty days of solitary confinement, when compared with the inmate's overall prison environment, was not the "type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Id.*

The Eighth Circuit considered whether the revocation of a prisoner's work release status was an atypical or significant deprivation in *Callender*. The court reasoned that the plaintiff had not suffered an atypical or significant deprivation when the plaintiff was returned to his prior institutional placement, had not yet participated in work release, and received no additional time on his sentence. *Callender*, 88 F.3d at 669. In so holding, the court relied on *Dominique v. Weld*, 73 F.3d 1156 (1st Cir. 1996). The plaintiff in *Dominique* had participated in work release for four years when his status was revoked, and he was transferred to a medium security prison. *Id.* (citing *Dominique*, 73 F.3d at 1157). The Eighth Circuit noted:

> On appeal, the First Circuit applied *Sandin v. Conner* and concluded that, because the conditions at the medium security facility were similar to those ordinarily experienced by a large number of inmates on a daily basis, placement in such a facility was not an atypical hardship. The Court noted that the change between the 'quasi-freedom' of work release and a medium security facility may have been a significant deprivation but, nonetheless, it was not an atypical deprivation. The Court also found that the state's action did not affect the duration of the inmate's sentence in any way.

*Id.* (citing *Dominique*, 73 F.3d at 1160).

---

As previously mentioned, the Court held that the proper focus should be on whether the deprivation "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. The Court reached this conclusion because the earlier approach discouraged state officials from codifying their administrative procedures and had inappropriately involved federal courts in the day-to-day management of prisons. *Id.* at 482-83.

In this case, revocation of Plaintiff's work release program was not an atypical or significant deprivation. Plaintiff was transferred to a more restrictive prison facility, and admittedly, there is a considerable difference between the freedoms Plaintiff enjoyed when he was in work release status at the CCC-O, which is the lowest custody level, and the conditions of incarceration at the OCC, which is a medium and minimum security facility. But Plaintiff does not allege that his transfer to a more secure facility subjected him to conditions different from those ordinarily experienced by large numbers of other inmates serving their sentences in customary fashion. Clearly, many inmates endured the same conditions of confinement that Plaintiff did when he was transferred to the OCC. Plaintiff alleges that upon his transfer to the OCC, he contracted COVID-19 and was placed in medical isolation as a result. Although the court is not unsympathetic to his plight, this is not atypical of what other inmates must endure given the COVID-19 pandemic.[3] Moreover, there is no indication that the duration of Plaintiff's sentence was in any way affected by the revocation of his work release status. Therefore, the court finds no state-created liberty interest in remaining in Nebraska's work release program.

### 3. Conclusion

In sum, Plaintiff has failed to establish that maintaining his work release status was a protected liberty interest under the Due Process Clause itself or the laws of Nebraska. Therefore, the court need not consider whether the procedures followed in revoking his work release status were constitutionally adequate. Accordingly, Plaintiff's § 1983 claim against Defendants for violations of the Due Process Clause of the Fourteenth Amendment will be dismissed with prejudice, and Defendants' Motion to Dismiss will therefore be granted in this regard.

---

[3] That he was transferred during the pandemic does not implicate any constitutional right. *See Futrell v. Cooper*, No. 3:20-CV-00543-MR, 2021 WL 1239823, at *2 (W.D.N.C. Apr. 2, 2021).

**B. State Law Claim**

Because the court dismissed Plaintiff's federal claim, the court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law defamation claim. *See* 28 U.S.C. § 1367(c)(3). Accordingly, the court will dismiss Plaintiff's state law claim without prejudice to Plaintiff's ability to pursue the claim in state court. *See Franklin v. Zain*, 152 F.3d 783, 786 (8th Cir. 1998) (court may decline to exercise jurisdiction over state law claims if it has dismissed federal claims; affirming dismissal of those claims without prejudice).

IT IS THEREFORE ORDERED that:

1. Defendants' Motion to Dismiss (Filing 28) is granted. Plaintiff's federal due process claim is dismissed with prejudice. Plaintiff's state-law defamation claim is dismissed without prejudice to reassertion in state court.

2. A separate judgment will be entered in accordance with this Memorandum and Order.

Dated this 23rd day of September, 2021.

BY THE COURT:

*Richard G. Kopf*
Richard G. Kopf
Senior United States District Judge